*327 Monday, April 25. The Judges delivered their opinions.
Judge Tucker
having stated the case, as above, proceeded as follows. As to the first point made by the counsel for the appellant, they endeavoured to confound a venire de novo, and a motion for a new trial; but they are very different things: they agree, indeed, in some things, but differ jn many. They agree in this — that a venire de novo must be ■ awarded in both cases, and that the Court may, or may not, grant either of them. But they differ, first in this that, a venire facias de novo is the ancient proceeding of the common law; a new trial is only a new invention, introduced on account of the severity of the judgment in attaint, to avoid which it was thought better to proceed in a milder way; and so new trials were introduced. They likewise differ in this respect, that new trials are generally granted where a general verdict is found ; a venire facias de novo upon a special verdict. But the most material difference between them is this; that a venire facias de novo, must be granted upon matter apparent upon the record; but a, new trial may be granted upon things out of it, if the record be ever so right; if the verdict appear to be contrary to the evidence given at the trial; or if it appear that the Judge has given wrong directions. In either of these cases, a new trial will be granted: but it is otherwise as to a venire facias de novo, which can only be granted in one or the other of these cases. 1st. If it appear, upon the face of the verdict, that the verdict is so imperfect, that no judgment can be given upon it. 2d. Where it appears that the Jury ought to have found other facts differently.(a) Now, ■ in ■this case, the motion for a venire facias de novo. was not founded upon matter apparent upon the record, but upon matter suggested by the affidavits presented to the Court four years after the trial. The defendant must have had a great reliance on his own memory, to impeach the verdict, at that distance of time, on the ground that it did not state a *328 particular fact, as it was proved by a particular witness, and that witxxess xnxxst also have had great confidence in hi? own accuracy and recollection, at the time of delivering his testimony, to have been positive that he l-elated every circumstance respecting an axxcient transaction, which he might, after sxxch a lapse, of time, be called upon again to state. If, then, the motion was intended as a motion for a new trials I think the Coux-t decided right in refusing to grant it. If, indeed, upon examining this verdict, it should appear to be so imperfect as that no judgment can be pronounced upon it, there must be a venire facias de novo, But, if enough appears upon the face of it, either to shew that the plaintiff hath no right to recover, or that the defendant hath no title to retain his possession, the neglect of the pax-ties to px-oduce evidence of other facts, however important, or of the Jury to find those facts, will afford no reason for a venire facias de novo. I shall therefore proceed to examine the second point.
2. Were those lands liable to be located by the defendant, and a patent obtained for them, upon the facts found by this verdict ?.
This is a question of such general ixnportance to the whole community, that it cannot receive a more deliberate and full discussion than it is entitled to. In as much as the whole landed propexrty in the Commonwealth may be subjected to forfeiture by the mere neglect of ministerial oflxeex-s employed in ascertainiixg and collecting the Commonwealth’s taxes, unless this Coixrt shall make such an interpretation of the laws as may obviate the danger..
I shall briefly remark that, under the first acts which passed for establishing a permanent revenue,(a) in case payment of the taxes were not made on or befox-e the first day of June annually, the sheriff was authorised to distrain the lands or slaves, goods or chattels, which might be found upon the lands, and in the possession of the person indebted or failing, notwithstanding such lands, slaves, goods or chattels, should be coxnpx-ised in any deed of *329 mortgageand, if the owner should not pay the taxes within five days, the sheriff might sell the same, “ or so much “ thereof,” as would be sufficient to discharge the taxes for ready money: but, if the same should not sell, in the opinion of the sheriff, for three-fourths of the value, then it should be sold on one month’s credit, giving six days notice of the time and place of sale, by advertising the same at the church, or other public places in the parish ; with a proviso, that, where the sheriff should seize any lands, he should sell the smallest number of acres that the lowest bidder would pay the taxes for: and the proprietor, or his agent might appoint what part of the tract should be sold; and, in case of failure on his part, the sheriff was to sell that part which, in his opinion, could do least injury or prejudice to the tract; and, where other sufficient distress could be had? no distress should be made of the lands. And, in case of unreasonable seizures, the party was entitled to his action, and to full costs, in case of recovering any damages. A subsequent act (a) entitled “ An act to remedy abu- “ ses in the manner of selling lands for payment of public taxes,” declares that such sales shall be made on the premises, and any sale made' otherwise shall be void; that no sale of lands shall be made if other sufficient property can be found in the County; that, before any sale shall take place, notice thereof shall be given, at least eight -weeks, in the Gazette of the public printer, and be advertised at the Court-house of the County on the first day of two several Courts; and proclamation made at the door of the Courthouse between 12 o’clock, and 4, of those days; that the sale be conducted by the high sheriff in person; and that he shall give notice to the commissioner of the land-tax, at least thirty days before the sale, to attend the same;. and, if the lands should not yield one half the value thereof, (regard being had to the estimate thereof in the equalizer’s books,) the commissioner was directed to bid for them on behalf of the public, with a power of redemption to the proprietor. And all sales, where the sheriff, or any de *330 puty sheriff, or any person in trust for them, .of either of them, should be the last bidder, should be considered as held in trust for the payment of the taxes, and might be redeemed by the proprietor by payment of the taxes»' charges of sale, and interest at the rate of six per cent, and ten per cent.- damages. Then came the act of 1790, c. S¿ by Which so much of every act as directs the sale of any lands for the tax thereon was repealed* and the sheriffs’ who had failed in completing their collections- Were directed to conform to the regulations prescribed by that act. Before no-1 ticing its provisions, it may be proper to state some other directions contained in antecedent acts;
By the act for equalizing the land-tax(a) and that foi* amending ,the acts for establishing a permanent revenue,(b) commissioners were to be appointed in every County, whose duty it was to value all the several lands-in their respective Counties,, and to make a list thereof in a book, in which the' names of the owners, the number of lots, (if in a town,} and the yearly value thereof, the quantity of-other lands,the value thereof per acre, and the amount of the tax there-dn, were to be inserted- — -and all alienations, or alterations'^ from time to time noticed therein. Each commissioner was to retain one of these lists in his own possession,- so long as he should continue in- officeand was to furnish the sheriff with a copy thereof, on or before the last day of May, annually ; by which the sheriff should proceed to collect from every person, therein named* the sum. chargedm thesaidbook, and no more. So that the commissioner's book certified by the clerk of the county,, according to the directions of the act, was to be the guide of the sheriff in collecting the taxes : and, without it, no collection could be made; which circumstance is recognized by the Legislature in the Sessions Acts of 1792, c. 27.(c) in which it is recited, that “ whereas no commissioners had been appointed in several- “ Counties, and from the neglect of commissioners in re-1 “turning a list of the taxable property in several other Goun- “ ties, by reason whereof no collections of the public taxes- “ have been or could be made,” &c. The act of 1786, *331 p. 6. made it the duty of the commissioners, also, to furnish the Clerk of the County, and the Solicitor or Auditor with copies of the same book of the land-tax; to be subject at all times to the inspection of all persons. And that deposited in the Auditor’s office was to be admitted as evidence in the General Court, for the amount of the taxes charged to the sheriff.
Such being the preliminary steps required by law, th.e act of 1790, c. 5. substituted the. following provisions in lieu of those for'which foe sale of lands for payment of taxes had been formerly authorised 5
1. That each sheriff shall, at foe time he returns a list of other insolvents, return also a list of foe lands within his County, or corporation, where he cannot find effects within, the same, belonging to foe owner or tenant, sufficient to satisfy and pay the tax. And, if the Court shall be satisfied of. the truth thereof, they shall admit the sheriff to make oath thereto, and direct foe same to be certified to the Auditor of public accounts, together with foe names of the owners of each tract, and foe place of their abode, where, the Court can obtain such information.
2. The Auditor shall credit foe same in account for the land-tax with foe sheriff — and, where it shall appear to the. Auditor, from the certificates of the County Courts, or from any other information, that any person chargeable with foe land-tax resides, or hath slaves, or personal property, in some other County, he shall certify the amount of his land-tax to the sheriff of foe County where he resides^ or hath slaves, or other property, and debit such sheriff with the amount, wl\o may make distress for the same, and shall be accountable therefor, as for other taxes of his. County.
3. A list of foese insolvents, with the amount of their faxes, respectively, shall be furnished by the clerk of the Courttofoe collector of the tax for the succeeding year, and he shall also transmit a copy thereof to foe Auditor, who. *332 shall debit the collector therewith; and he shall distrain. and account for the same, as for other taxes.
4. In case the said taxes cannot be collected the succeeding year, the like return upon oath, shall be made, as before prescribed; “ and, thereupon, the treasurer shall “ cause to be inserted in the Virginia Gazette, for three “ weeks successively, the names of such delinquents, with “ the quantity of land, the situation thereof, and the taxes “ due thereon.” Then follows this important clause:
5. That in case the tax on any tract of land shall not be paid for the space of three years, the right to such lands' shall be lost, forfeited, and vested in the Commonwealth : and it shall be lawful for any person to acquire a title to any, lands so forfeited., in the manner prescribed for acquiring titles to waste and unappropriated lands on the-eastern-waters, by an act entitled, “ An act to dispose of the waste and- “ unappropriated lands in the Commonwealth of Virginia, on “ the eastern waters,(a) with a saving in favour of the rights of- “ infants, feme's^covert, and persons non compos mentis, who “ are allowed three years to save the same from forfeiture, “after such disability is removed.” This act hath.been-consolidated, with that which respects the duty of'the commissioners of the land-tax, and the powers and duties of the sheriffs and collectors, in the generallaw of 1792, Rev. Co. c. 83,(b)
I shall consider this clause of the act first; and my first inquiry, respecting its operation and construction, will be, when, and in what manner, lands, upon which taxes have not been paid for the space of three years, shall be lost by the owner, and vested in the Commonwealth.
By the 20th article of the Constitution of Virginia, all escheats, penalties and forfeitures, heretofore going to the king, shall go to the Commonwealth, save only such as .the Legislature may abolish, or otherwise provide for.
At the period of the revolution, the crown was entitled - to a quit-rent of two shillings for every hundred acres of land granted by it, which was reserved by the express *333 terms of the patent; and, if this quit-rent was not paid, for three years together, the act of Assembly declared, that -the patentee should not only lose the land, but also all benefit of the rights upon which he obtained his patent. But no patent could be granted by reason of such forfeiture, until judgment and certificate thereof obtained from the General Court, in the manner prescribed by the act.(a) These quit-rents were abolished by the act of -May, 1779, c. 13. so that there no longer remains any cause of forfeiture of lands in Virginia, by reason of any condition in the patent or grant thereof. And, by a subsequent act,(b) forfeitures of lands, for treason and other offences, were wholly abolished. So that no forfeiture of lands in this Commonwealth can take place, but in consequence of the positive provisions contained in some public statute; except in the case of aliens purchasing lands therein.
I have always considered that, from the period of our revolution, the Commonwealth succeeded to the political character of the king, in all cases whatsoever; and that its rights, privileges, and remedies, were to be, in general, ascertained by the standard of the common law, as it respected the political character of the king, where the same were not controuled, or enlarged, by the express terms of the constitution, or the clear and definite provisions of some statute of the Commonwealth. On this ground I have held, that the Commonwealth (like the king in his political character) could neither take, nor quant any thing but but by matter of record.(c) The reason given by the latter is, “ that it is part of the liberties of England, and greatly “ for the safety of the subject, that 'the king may not enter “ or seize any man’s possessions, upon bare surmises, witlr- “ out the intervention of a Jury.” This reason is equally applicable to our government as to a monarchy; or rather, in a government founded upon the principles of liberty, the reason is stronger than in any other. There is one exception, however, to this rule in England; it being particularly enacted, by the statute of 33 H. VIII. c. 20. that, *334 in case of attainder for high treason, the king shall have the forfeiture, instantly, without any inquest of office. The period when this statute was made was under a bloodthirsty tyrant, whose Parliaments were but abject registers of his arbitrary edicts. Nevertheless, in the construction of this very statute, it hath been held, that if one be at-tainted of high treason, all his lands, by virtue of that statute, are presently in the king, that is, the estate in the lands is in the king, without office found: but, it doth not appear to the Court of Exchequer of what lands the person attainted was seised, at the time of his attainder, or .after; and, therefore, there goes a commission from the Exchequer, under the seal of that Court, to make such inquiry; and this is called an office of instruction; and this is a sufficient record to instruct the king of the certainty of the land., by which it may be put in charge,(a) And, before that statute, it was held, that, if a man was attainted of high treason .by act of parliament, and it was thereby enacted, that he should forfeit all his lands, yet that that was not sufficient to vest any freehold in deed or in law, in the king, until an office found; for the words “ shall forfeit” were only sufficient to vest a right, or title in the king. (b) And the same doctrine is recognized by the unanimous opinion of the Court, 3 Co. 10. Dowtie’s case. And, in both these cases, the authority of Brooke, tit. Office, 17, was relied on, to this effect. Where a man is attainted by Parliament, and thereby it is ordained, “ that all his “ lands shall he forfeited, and it is not said, they shall be in “ the king without office,' there they shall not be in the “ seisin of the king, to grant over, without office, for “ it does not appear of record, what lands they are.”- So, in the present case, although the taxes be not paid on certain lands, the property of A. in the County of B, for the space of three years, whereby the right to those lands is forfeited to the Commonwealth, yet, until an office be found, or some other legal proceeding had, (if any such can be pointed out,) to shew the certainty of the land., the seisin *335 thereof -is not in the Commonwealth to grant over; and, Without such seisin, any grant thereof would be void by the common law; for the Commonwealth having but a right, and not a seisin, cannot make a grant of lands, as was adjudged in Dowtie's case, 3 Co. 10. And this construction of the act is confirmed in my opinion, by the remarks of Sir Edward Coke(a) upon that clause of the statute of Westm 1. c. 31. which relates to tolls, by which it is declared, that if excessive toll be taken in any city, &c. the king shall seize the franchise of the fair or market, Until it be redeemed by the owner. “ But,” says Lord Coke, “ this is intended upon an office found ; for, in “ statutes, incidents are ever supplied by intendment.”
Many reasons, in support of this opinion, may be drawn, I conceive, from the act itself. All the description which it requires is, the name of the owner, the quantity of land, the rate per acre, and the amount of the tax thereon: its situation, boundaries, and every other circumstance relating to it, or to the title to it, are subjects foreign to the purposes of collecting the taxes thereon, though indispensably necessary to be known, in order to a grant thereof.This, it may be supposed, may be supplied by the location and survey. Now, let it be granted, that a man hath two tracts, of 500 acres each, in a particular County, upon one of which he hath paid the tax, and hath failed to do it upon the other. Shall any person presume to enter upon which-soever of them he pleases to make his location? And, without something more than the act requires, I cannot see how the Commonwealth could ascertain the particular tract that may be forfeited. The conclusion which irresistibly presses itself upon my judgment, is, that, previous to any grant, or location thereof, there must be some further in* quiry made; and, as at present advised, that this must be, done, either by an inquest of office, or some other mode to be provided by the Legislature, wherebythe certainty of the lands may be shewn, and the seisin, as well as the right vested in the Commonwealth.
*336 A further reason in support of this opinion arises from that principle of moral justice, recognized by Magna Charta in England, and by the statute of our own Commonwealth, (which is a transcript from the former,) whereby it is declared, that no citizen shall be disseised of his freehold, or be condemned, but by lawful judgment- of his peers, or by the laws of the land; the meaning and intention of which certainly is, that ho man shall be deprived of his property, without being first heard in his own defence.(a) In the case before us, the plaintiff has been disseised of his lands, and they have, been granted over to a third person, without any notice or warning whatsoever.
But, if no such previous inquiry be necessaxy, hath the defendant shewn that all that was necessaxy to be done, on the part of the Commonwealth, hath been done, so as to preclude the owner of the lands from objecting that the non-payment of the taxes on these lots is not imputable to hixnself, but to the ministers and officers of the Commonwealth ?
By the 32d section of the present law, if payment be not made by any pex-son chargeable with the land-tax, the sheriff may distrain the slaves, goods and chattels which may be found thereon. Ought it not to be shewn, that no distress, sufficient to pa}'- the taxes, could be fouxxd on the pi-exnises ? Ought it not to be shewn, that the owner had nothixig upon which the distress could be levied in the county ; since the power of distraining for the tax is not limited to the lands themselves, but may be exercised upon any property in possession of the delinquexrt, by the same section? ■-
Ought it not to have been shewn, that there were comxnissioners of the tax appointed in the County of Augusta, or perhaps in the town of Staunton, within the limits- of which the verdict finds that the lots are ? (and, although it is not found that Staunton is a cox-poration, (as is the fact,) that circumstance might fxxrnish ground for a venire facias de- novo, but could not otherwise affect the case, I con *337 mve;) and that they made a list of the lands, and delivered a copy of it to the sheriff, (or' sergeant of the town,) as Ms guide in the collection of the taxes; and that this was done, from year to year, as, the law requires, for three years successively ? And if, in fact, no commissioners were appointed, or', if they neglected to return a list of the taxable property in the county (or town) pursuant to the act, llave we not the authority of the Legislature itself, declared in 1792,(a) that no collection could be made in consequence of such omission?
Those parts of the special verdict which relate to Mr.. BelPs acting as a commissioner in 1782, and his application to Mr. Zends'as the agent of Beverley, have iiothing to do with this case. They relate to a period, when no for-, feiture could be incurred of the lands themselves, without qn actual seizure thereof, by the sheriff, by way of distressi The present defendant claims under a forfeiture of the whole lands, incurred by mere delinquency, -without seizure. I, therefore, throw them entirely out of the case.
Again: Are all the directions of the act of 1790, which are consolidated in- the act of 1792,(b) to be wholly disregarded ? If so, how is the fact of delinquency, on the part of the owner of the lands, by non-payment of the taxes, to appear ? For, by that act, it will be observed, the sheriff is directed to return a list of the lands within his County, (where he cannot find effects -within, the same, belonging to the owner or tenant thereof, sufficient to satisfy the tax,) to his County Courtand, if the Court shall be satisfied of the truth thereof, they shall admit him to make oath thereto* This shews that the Legislature does not repose implicit confidence, in the diligence, "or fidelity of the sheriff; since, without some such precaution as the law requires, he might find a double motive for neglecting to collect the tax; for in case a forfeiture of the lands could be incurred by the mere non-payment of the taxes, he would be.the first person informed of it,_ and might be the first to locate, and *338 obtain a grant for the lands, thus forfeited,- through his own neglect or worse conduct.
The only fact, found in the special verdict, serving as a foundation for a grant of these lots to the defendant, is, that no taxes ever were paid for the lands and lots in the declaration mentioned, since the year 1780. Oh the other hand, it is expressly found, that the commissioner or commissioners of the land-tax in the County of Augusta, did not value the said landsand that no account was ever returned of them, by the said commissioner or commissioners, to the proper officer for collecting the taxes for fire County aforesaid. This alone is sufficient to defeat the defendant’s right-, to locate the lands, or to obtain a patent for them; because, Without such valuation, and return thereof, to the collector of the taxes, no collection could have" been made, as emphatically expressed by the Legislature^ in the act of the same session before referred to .(a)
But, were it otherwise, the defendant hath not pursued the proper course in making his locations^- They bear date the 19th June, 1794, and, consequently, ought to have been founded upon the laws then in force and existence: but they are expressly alleged to be made by virtue of a land-office treasury warrant, dated June 11th, 1794, issued to-A. Stuart, under the 5th section of the 5th chapter of the acts of 1790, and die land-law of the 17th of December, 1792. Now the act of 1790, c. 5. Was repealed by the act of 1792, c. 83. ed. 1794. Consequently no location could be made, nor any land-office treasury Warrant issued, in pursuance of that act, in June, 1794.- If it be objected, that the provisions contained in the two laws are precisely the same, and therefore the misrecital of the statute is of no importance, a twofold answer- may be given. First, that such misrecital, made on- the suggestion of the partyr would be fatal in a patent or grant from the Commonwealth.^) Secondly, that the act of 1790, c. 5. sect. 5. declares, that a title to lands forfeited for non-payment- of taxes, may be acquired in the manner prescribed by “ An *339 i1' act to dispose of the waste and unappropriated lands in 11 the Commonwealth of Virginia, on the eastern waters;”(a) that is to say, by paying the consideration of tiventy-fve pounds for every hundred acres, and soj in proportion, for a greater or smaller quantity: whereas the land-law, passed in 1792,(b) expressly declares, that no warrant shall issue, to be located on any lands which may vest in the Commonwealth on account of the non-payment of the taxes thereon, unless the person applying for the same shall pay, in consideration thereof, one hundred dollars for every hundred acres ; and, for the better direction of thé surveyors, the register shall express in the warrant what sum was paid therefor. Now no sum is expressed to have been paid; but the warrant referring to the former act, which fixed the price at 25l. per 100 acres, creates a Violent presumption that no more was paid, although 30l, was the consideration required by the law then in force: the Commonwealth was therefore deceived in its grant of this warrant, which thereby was utterly void; as it would have been in the case of the king, 2 Bl. Com. 348. or, if not void for that cause, it was void for the uncertainty as to the sum actually paid.
The defendant’s patent appears to me to be liable to the same objection of uncertainty, and insufficiency, from the omission to recite the manner by which the Commonwealth had become entitled to these lands, which it is now found were patented seventy years ago, and have been held by the plaintiff, and those under whom he claims, upwards of half a century. There is not So much as a surmise of the person to whom they were formerly granted, nor of the manner by which the Commonwealth became seised of them again, and entitled to make a grant thereof. The suggest tion of forfeiture for'non-payment of taxes, if such a suggestion can be inferred from the reference to the land-office treasury warrant, referred to but not recited in the preamble of the patent, is the suggestion of the patentee, and not of the Commonwealth, and therefore is to be taken *340 most strongly against the party making it; and, since it contains no manner of certainty, as to any of those parti-» culars which were necessary to be known, in order to a proper and effectual grant thereof from the Commonwealth, the patent itself appears to me to be absolutely void, for this reason, also. For these lands having been once granted by the crown, by patent, (which is a record óf a high nature,) the cancelling, avoidance, or forfeiture, of that grant, ought to appear in any subsequent grant thereof by the Commonwealth. For the first patent, is conclusive evidence of a title against the Commonwealth, until such avoidance or forfeiture be shewn; and, when shewnj it ought to appear upon the face of the second patent, that it might not be presumed that the Commonwealth was ignorant of the first grant, and so deceived in its grant to the defendant. As, if the king made a lease’ for yeax*s, or for life, and afterwards granted the land ta another in fee or in tail, -without reciting the lease, the last grant is void. (a) So, here, the crown having granted these lands to Beverley, and the Commonwealth (without noticing’ that'grant, and without mentioning for what cause the lands were revested in the Commonwealth) having undertaken to grant the same lands to the defendant, and no title in the Commonwealth appearing, or being shewn by the patent, the patent is void for that cause.
But it may be objected, as the patent .mentions, that by virtue of such a land-office treasury warrant as that here spoken of, the lands were granted, it» shall be presumed they were forfeited for non-payment of taxes ; and the rather, because the Jury have found that the grants regularly and duly issued to the defendant. To this I answer, that this is a conclusion in law, which the Jury have undertaken to make, and not mattewof -fact, if, by these words, they meant to say iqore than this, that the patent issued from the proper ‘ office, and with the usual solemnities. But, they having found the patent in hace verba, the Cour-t; will decide, whether it be a regular apd proper patent, oy not.
*341 But, it may be objected, that the patent having issued with the usual solemnities, the Commonwealth’s officer shall be presumed to have acted regularly in issuing it. But no such presumption is ever made in favour of a ministerial officer, where recourse can be had to the authority under which he has acted, and to the thing itself.\ that is done; for that would be to substitute confidence in the officer, for the due performance of his duty. Now, when omissions or misrecitals appear in a patent, there is no room left for presumption.. Besides, there is one particular in which the Commonwealth's grants differ from many of the king's grants. The latter were often made, “ ex “ ?nero motil .et certa scientiaf of the crown; in which cases they were always construed more liberally in favour of the subject. But the Commonwealth's grants of lands are invariably founded upon the suggestion of the party praying the patent; and, therefore, are always to be taken most strongly against him.
There is yet another objection to this patent, which I cannot pass over: it is not in the form prescribed by' the 42d section of the land-law; nor does it mention the sum paid into the treasury, as that form requires. And I hold that, where a statute prescribes a particular form to be observed in any case, that form must be strictly pursued. How such a deviation from it has crept into the present patents, I have not thought it necessary to inquire.
3. As to the third point — that the release from Sir John Randolph and the other original patentees to Beverley, being made without any consideration, and not' being indented, nothing passed thereby, I think it unnecessary to be considered, as it is expressly found that William Beverley died seised in 1756, and that Robert, his son, entered and was seised from that period, until the time that Kinney obtained his patent in 1795 ; a period long enough to establish the right of possession in Beverley, and consequently to epable him to recover in this ejectment,
*342 Much as I have said in this case, which, from its general importance, I considered as entitled to the most mature deliberation, I have omitted many things, upon the second point, which have occurred to me in support of the opinion I have given upon it. And, upon the whole of this case, (in whatever view considered,) I am of opinion, that the judgment of the District Court ought to be affirmed.
Judge Roane.
The clause under which the locations in question were made,-'was first introduced into our laws in the year 1790. (a) It is contained in an act to amend the act passed in 1787,(b) intituled, “ An act to remedy ” abuses in the manner of selling lands for the payment of “ public taxes.” Both the acts of 1787, and that of 1790, relate entirely to lands duly listed and assessed by the commissioners. The act of 1790, in particular, in the sections immediately preceding the one in question, makes certain provisions in relation to the taxes due on such lands. The terms “ the tax,” mentioned in the fifth section, have before several times occurred in the preceding sections, and there plainly related only to lands which stood taxed upon the commissioners’ books; and it is a sound rule of construction, that the same phrase occurring in different parts of the same act, shall generally be understood in the same sense. This construction loses none of its force when we consider the case as upon the 35th section of the act of 1792,(c) which agrees verbatim as to the points in question, with the clause in the act of 1790. It not only follows immediate after a section relating only to assessed lands', but is also contained in the act for ascertaining taxable property, &c. whereby it is made the duty of the County commissioners to list and assess all lands within their several Counties. It has been said, that the omission to return lands to the commissioners is an offence of a higher grade, than the omission to pay the tax: while this might be safely admitted, yet, in the case of fin highly *343 penal act, we cannot extend the construction thereof beyond the actual case which is provided for. By the act of the 26th of December, 1792,(a) it will be seen that the neglect of the commissioners in returning- a list of taxable property was taken up by the Legislature, and provided for. This subject was, therefore, before the Legislature at the same time with the act immediately in question; and, although, in fact, the latter act passed a few days before the former, this Court will judicially know, that that may have been merely accidental; and that in this session of revisal, the whole subject of our laws was depending at the same time before the Legislature. On what other ground than this, did it happen, that the commissioners’ act of this session now in question,(b) which passed on the thirteenth of December, 1792, referred in the 35th section thereof, to the land-law of the same session, by its title, which did not pass until the seventeenth day of the same month ? This Whole subject then was depending' at the same time before the Legislature; and therefore, as another act related to this subject, the 35th section now in question did not mean to extend to this case of ail omission tb give in land for assessment. Even afterwards, when it was found that this' evil required legislative interposition, it was only done by extending the powers of the commissioners, and enabling them to ascertain and value lands, not given in, by the best lights in their power.(c),(1)
My opinion, therefore, is, that the legislative construction upon this Subject, manifested in their declaratory act of 1794, is the true construction of the act now in question ; and that no lands are forfeited under the same, unless they have been assessed and returned pursuant to law.(d) It is here to be remarked* that the annual tax-laws impose a tax, per centum, on lands, “ for every hundred dollars “ value, agreeable to the equalizing lawand that, in relation to lands charged on the commissioners’ books, it is *344 easy for the owners thereof to know the amount of, and to' pay their respective taxes, which is not the case in relation to lands which have not been assessed.
On the merits of this case, therefore, the decision is right, and no occasion exists for a venire ele novo. I should give the same opinion that I now do, if Beverley, the appellee, were found to have resided in Augusta.
I do not meddle with the other points in the case, except to say, that I cannot for a moment doubt the power of the Legislature to pass the law in question; nor can I think that, under the influence of that power, and the actual provisions contained in that law, there is any pretence to say, that locations under the act must, be preceded by inquisitions of office. Such a construction would defeat the great end and object of our acts, in this particular; would greatly affect our revenue; and can only gain colour by giving to the principles of the common law, in respect of inquisitions, (as applying to ordinary cases,) a supremacy over the positive acts of our Legislature.
While, therefore, I feel myself bound to differ in opinion from the Judge who has immediately preceded me in respect to some of the positions taken by him, (which, however, I do not hold it necessary to enter particularly into at present,) I concur with him, for the reasons I have just stated, that the judgment should be affirmed.

 1 Wilson, 55, 56.

 L. V. 1781, c. 40. and Oct.1782, a 8.

 1787, c, 42.

 Oct. 1782 c. 19.

 1786, c. 6.

 See Rev. Code, vol. 1. p. 454. Appendix, c. 6. sect. 8.

 Sessions Acts, 1785. c. 42.

 Vide Tucker’s Black. 286. note 13.

 L. V. 1748, c. 1. s. 29, 30.

 Edit. of 1794, c. 74. s. 31.

 Plowd. 213- 484. Finch, 82-3 Bl. Com. 259.

 5 Co. 52. Page’s case.

 Plowd. 486. Nichol's case.

 2 Inst. 221.

 2 Inst. 49, 50.

 C. 27. Sessions Acts, Rev. Code, 1 vol. p. 454.

 Ed. 1794, c. 83. s. 34.

 Sessions Acts, 1792, c. 27. s. 3.

 Dyer, 77. Ibid. 195. 10 Co. Rep. 110.

 1785, c-42.

 Ed. 1794, c. 86. sect. 5.

 l Co. 45.

 Sessions Acts of 1790, c. 5. sect. 5. and Revised Code, vol. 2. Appendix, No. ix. c.17. p. 106.

 Rev. Code, vol. 2. Appendix, No. ix. c. 9. p. 95.

 Rev. Code, vol. 1. c. 83. p. 134.

 Sessions Acts of 1792, c. 27. sect. 3. and Revised Code, vol. 1. Appendix, p. 454.

 P. 128, of Rev. Code, vol. 1.

 Acts of 1795, c. 5. p. 12. and Rev. Code, vol. 1. c. 185. p. 342.

 See Sessions Acts of 1794, c. 21. p. 15. and Rev. Code, vol. 2. Appendix, No. ix. c. 34. p. 125.

 See also the act of Jan. 31st, 1804, Rev. Code, vol. 2. p. 68, 69.